**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEYONNA GARLAND,** | : | **Civil No. 1:25-CV-01318** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

## I. Introduction

Administrative Law Judges (ALJs) make disability determinations using a five-step sequential analysis which first establishes a residual functional capacity (RFC) for a claimant and then determines whether an individual with the claimant's same age, education, and RFC could perform either their past work or any work that exists in significant numbers in the national economy. ALJs use a number of tools and experts to aid in this determination, including vocational experts (VEs) whose testimony often informs and supports the decision of the ALJ as to whether any jobs exist which the claimant could perform. Indeed, "vocational expert testimony may provide substantial evidence to support an ALJ's finding at Step 5." Evans v. Kijakazi, No. 1:21-CV-00554, 2023 WL 2761125, at *8 (M.D. Pa. Apr. 3, 2023)

(citing Zirnsak v. Colvin, 777 F.3d 607, 616 (3d Cir. 2014) ("The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden")). But it is also axiomatic that an ALJ must address and resolve any material ambiguities and inconsistencies between vocational expert testimony, the Dictionary of Occupational Titles (DOT), the reference work upon which the expert relies upon when rendering an opinion, and the ALJ's decision, or remand may be appropriate. See Boone v. Barnhart, 353 F.3d 203, 209 (3d Cir. 2003); Sanchez v. Dudek, No. 3:24-CV-00240, 2025 WL 924046, at *1 (M.D. Pa. Mar. 26, 2025); Smith v. Astrue, 961 F. Supp. 2d 620, 658 (D. Del. 2013); Williams v. Barnhart, 424 F. Supp. 2d 796, 802 (E.D. Pa. 2006).

So it is here. In the instant case, the ALJ based his decision that the plaintiff, Keyonna Garland, was not disabled upon vocational expert testimony that was flawed and fatally ambiguous in at least two ways. First, the vocational expert's testimony was internally inconsistent in that the VE identified three jobs the plaintiff could perform if limited to only occasional interaction with others, yet later seemed to testify that this same limitation would be totally disabling. The VE's testimony was also seemingly inconsistent with the DOT since all of the occupations identified by the ALJ seem to conflict with the RFC's limitation to no fast-paced production

work, since they are assembly line occupations which are definitionally fast-paced production rate work. In our view, the ALJ's failure to address these ambiguities and inconsistencies results in a decision which cannot be sustained when viewed pragmatically in light of economic realities. Accordingly, for the reasons set forth below, we will remand this case for further consideration by the Commissioner.

## II. Statement of Facts and of the Case

On April 27, 2022, Keyonna Garland filed an application for Supplemental Security Income (SSI), alleging disability beginning December 15, 2021, due to anxiety and bipolar disorder. (Tr. 17, 267). Garland was born on October 22, 1986, and was thirty-five years old, which is defined as a younger individual under the Social Security guidelines, on the alleged disability onset date. (Tr. 73). She had a limited education, having left school in tenth grade, but later obtained her GED, and had past work as a collections clerk. (Tr. 43, 53).

Garland alleges limitations in her ability to perform work-related activity based upon her mental impairments, specifically, she testified she is unable to get along with others and deal with social interaction due to anxiety. (Tr. 41). With regard to her mental impairments, the ALJ aptly summarized the longitudinal treatment records:

> The claimant has a history of bipolar disorder, generalized anxiety disorder, and panic disorder with medication management including Prozac, Remeron, Mirtazapine, Alprazolam, and Latuda along with counseling and outpatient therapy services in 2017 and 2018 (Exhibits 1F, 2F, and 3F). She continued with medication management (Exhibit 10F).
>
> In February 2022, the claimant referred herself for worsening depression and anxiousness when she stopped taking her medications three months prior. She noted manic episodes with decreased sleep, rapid speech, irritability, and impulsive shopping and depressive episodes in which she is not capable of doing anything due to a lack of motivation and increased sleep. The mental status examination was normal with no abnormal thought content, including paranoia. Memory and concentration were intact as were judgment and insight. Her psychiatric medications were restarted with Latuda and Vistaril (Exhibit 5F/15-19). Subsequent mental status examinations were similar. Despite some mental status examinations finding the claimant with sad mood and anxiousness, her functioning has been intact and normal for thought content and process. She is oriented to person, place, time, and situation. Attention and concentration are intact. She denies serious symptoms of suicidal or homicidal ideation, and her allegations of paranoia do not match her presentation at the examinations with no paranoia or delusional thought. Insight and judgment are fair with medication compliance issues (Exhibits 5F/20-36, 8F, and 14F). The March 2024 examination finds the claimant doing better with medication compliance including Zyprexa and Vyvanse (Exhibit 14F). Additionally, the neurology and primary care providers note the claimant is alert and oriented to person, place, and time and with normal mood and affect during the examinations (Exhibits 9F, 12F, 13F, and 15F).

(Tr. 24).

In addition to the medical records, three experts opined on Garland's mental impairments and all conceded her functional abilities would be limited by her mental

impairments but reached different conclusions regarding the extent of these limitations. On this score, her treating psychiatrist, Dr. Ankit Jain, concluded in December 2022 that Garland's mental impairments were completely disabling at least in part due to her inability to interact appropriately with others. According to Dr. Jain, Garland would be unable to meet competitive standards for sustaining concentration, persistence, and pace and in getting along with coworkers or peers without distracting them and had no useful ability to keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness or to ignore or avoid distractions while working. (Tr. 609-10). Dr. Jain also opined that Garland would frequently be off-task and miss more than four days of work per month. (Tr. 611). Dr. Jain explained that Garland would be unable to sustain work on a full-time consistent basis because she experiences extreme anxiety and panic attacks and attends multiple visits and therapy. (Id.)

Two State agency experts also opined on Garland's mental abilities and opined that the plaintiff's mental impairments were severe. Nonetheless, each of these experts concluded that she was only mildly limited in her ability to understand, remember, or apply information and adapt or manage herself, and moderately limited in her ability to interact with others and concentrate, persist, or maintain pace. (Tr. 75-76, 83). With regard to the plaintiff's ability to interact with others,

both experts, who had never examined or interacted with the plaintiff, concluded that, "although she may have some difficulty in public social interaction due to her MH impairments, the claimant has the ability to maintain socially appropriate behavior . . . She also has the ability to get along with others reasonably well, ask simple questions, and accept instruction/advice." (Tr. 78, 86).[1]

Despite these conflicting views of the plaintiff's ability to interact with others, the ALJ seemed to embrace her limitations in this arena at the hearing on May 13, 2024, and properly posed hypothetical scenarios to the vocational expert including these limitations. Thus, when the ALJ asked the VE what jobs an individual of the plaintiff's age, education, and RFC, could perform, the hypothetical included mental

[1] In considering whether the plaintiff experienced understanding and memory limitations, these experts also concluded, "Although she might have some difficulty, understanding, retaining, and following complex, detailed instructions, the claimant can understand, retain, and follow simple task instructions, i.e., perform one and two-step tasks. Her basic memory processes are intact for both recent and remote events. She can perform simple, routine, repetitive tasks in a stable environment." (Tr. 77, 85). This RFC narrative explanation was notable since it mentioned the plaintiff's ability to perform "one and two-step tasks," and the unexplained failure of an ALJ to address, acknowledge or incorporate a one-to-two-step task limitation set forth in a persuasive medical opinion constitutes error which may compel remand. See e.g. Cruz v. Bisignano, No. 1:24-CV-1966, 2025 WL 2813882, at *7 (M.D. Pa. Sept. 30, 2025). The ALJ did not address the one and two-step task limitation here, however the plaintiff does not challenge this omission since it appears all of the jobs identified by the ALJ are reasoning level one, which the plaintiff could perform even if limited to one-to-two-step tasks. Reep v. Bisignano, No. 1:24-CV-712, 2025 WL 1508453, at *9 (M.D. Pa. May 27, 2025).

limitations of no specific production rate pace, such as assembly line work or an hourly production quota, and only occasional interaction with the public, coworkers and supervisors. (Tr. 53-54). The VE concluded an individual with the limitations outlined in that hypothetical could perform the occupations of machine feeder, DOT 583.686-014, line attendant, DOT 920.687-042, and product sorter, DOT 529.687-186. (Id.)

But, later in the hearing, plaintiff's counsel had the following exchange with the vocational expert which raised questions as to whether the plaintiff could perform any work given this limitation to occasional interaction with others:

> Q. So let me ask you this, if frequently, and by frequently, I mean two thirds of the day, an individual was unable to interact appropriately with the public, coworkers and supervisors would that preclude the jobs you've named in all work?
> A. Inappropriately is such a broad term. I'm comfortable saying that it would result in being off task 15% or more of the time, that would exclude all occupations, which could reach that level of inappropriateness.
> Q. Okay. What if I took out appropriately and just two thirds of the day, they're unable to interact with public coworkers and supervisors?
> A. Inability to interact with others as we outlined would not be consistent with competitive employment and that would exclude all occupations.

(Tr. 58). Thus, while the ALJ at first identified the occupations the plaintiff could perform if limited to only occasional interaction with others, meaning "from very little up to one-third of the time," Titles II & Xvi: Determining Capability to Do

Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983), the VE later testified that an inability to interact with others two thirds of the day would be inconsistent with competitive employment.

The ALJ never rehabilitated or addressed this inconsistency in the vocational expert's testimony, and, instead, issued a decision on June 7, 2024, denying Garland's disability claim. In that decision, the ALJ first concluded that Garland had not engaged in substantial gainful activity since April 27, 2022, the application date. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Garland had the following severe impairments: seizure disorder, bipolar disorder, generalized anxiety disorder, and panic disorder. (Id.) At Step 3, the ALJ determined that Garland did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 20-22). While the ALJ ultimately found that the plaintiff's statements about her limitations were not entirely consistent with this medical evidence, the ALJ concluded that her mental impairments caused moderate limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Tr. 20-22).

Having made these findings, between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which accounted for these moderate mental limitations, finding that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes or scaffolds. She can never tolerate exposure to unprotected heights, and she can never operate hazardous machinery. The claimant can understand, remember or carry out simple instructions. *The claimant can perform tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota.* The claimant can deal with occasional changes in a routine work setting. She can make judgments on simple, work-related decisions. *The claimant can occasionally interact with the public, coworkers and supervisors in a routine work setting.*

(Tr. 22) (emphasis added).

The ALJ then concluded at Step 4 of this sequential analysis that Garland could not perform her past work, (Tr. 28), but found at Step 5 that there were other jobs that existed in significant numbers in the national economy which Garland could perform. (Tr. 29-30). In reaching this conclusion the ALJ embraced the enigmatic testimony of the vocational expert and concluded that Garland could perform the occupations of machine feeder, bottling line attendant, and product sorter, despite the VE testimony bringing into question whether an individual limited to occasional interaction with others would be precluded from performing these jobs.

(Tr. 27-28). The ALJ's adoption of these occupations is also striking in that each of these jobs requires assembly line work,[2] yet the RFC limits the plaintiff to "tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota." (Tr. 22). The ALJ explained that there was basis to rely upon the testimony of the vocational expert, stating:

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The vocational expert testified that there are no conflicts between the DOT requirements and hypotheticals limitations and indicated that matters covered in testimony not addressed by the DOT include breaks and absences. The basis of the testimony related to those considerations is training, education, and professional experience in the vocational rehabilitation field. Because the vocational expert provided additional information based on professional experience about the above occupations not addressed by the DOT and the claimant made no objection to the vocational expert's qualifications or basis of the testimony, the undersigned finds that there is a basis for relying on the vocational expert's testimony.

---

[2] See Fusing-machine Feeder, DICOT 583.686-014, 1991 WL 684347 ("Aligns material and garment part on conveyor for feeding into machine that heat seals materials. Removes finished articles from conveyor belt."); Bottling-line Attendant, DICOT 920.687-042, 1991 WL 687971; ("Pastes labels and tax stamps on filled whiskey bottles as bottles pass on conveyor . . . ."); Sorter, Agricultural Produce, DICOT 529.687-186, 1991 WL 674781 ("Segregates produce on conveyor belt or table . . . and places produce in containers or on designated conveyors.").

(Tr. 28). Thus, the ALJ relied upon the declaration of the VE that his testimony was consistent with the DOT, but failed to reconcile or acknowledge the internal inconsistency in his testimony that Garland could perform these occupations even if she were only able to interact with others one-third or less of the day but would be unable to sustain employment if she were unable to interact with others two-thirds of the day. The ALJ also failed to reconcile the inconsistency between the VE's testimony that an individual with the plaintiff's RFC could perform these jobs and the DOT which defines them as assembly line work.

This appeal followed. (Doc. 1). On appeal, Garland argues, *inter alia*, that the identified jobs are inconsistent with the RFC limiting her to only occasional interaction with others. As discussed below, we agree that the ALJ failed to account for meaningful ambiguities and inconsistencies in the testimony of the vocational expert with regard to the occupations an individual with Garland's RFC could perform. Accordingly, we will remand this case for further consideration by the Commissioner.

## III. Discussion

### A. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ.

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

**B. The Role of the Vocational Expert and Dictionary of Occupational Titles in Disability Analysis.**

Oftentimes, as in this case, an ALJ turns to the testimony of a vocational expert based upon data drawn from the Dictionary of Occupational Titles to carry the Commissioner's burden at Step 5 to show that jobs exist in significant number in the national economy that the claimant can perform consistent her age, education, work experience and RFC. In this setting:

> Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy.

Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005). When opining on this question, the vocational expert, in turn, "will generally consult the Dictionary of Occupational Titles (DOT), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).

The evidentiary value of this vocational expert testimony and reliance upon the Dictionary of Occupational Titles to carry the Commissioner's Step 5 burden of proof is directly a function of how accurately that testimony reflects economic reality. Recognizing this fact, the Dictionary of Occupational Titles catalogues a compendium of job titles, describing the responsibilities of myriad tasks, and assessing the physical, exertional, learning and language requirements for each of these jobs. And the purpose of the hypothetical questioning of the vocational expert is to reconcile the limitations in a claimant's RFC with the requirements of the jobs as described by the DOT. On this score, "vocational expert testimony may provide substantial evidence to support an ALJ's findings at Step 5." Evans v. Kijakazi, No. 1:21-CV-00554, 2023 WL 2761125, at *8 (M.D. Pa. Apr. 3, 2023) (citing Zirnsak, 777 F.3d at 616) ("The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden"). But "[a] vocational expert's testimony is not

substantial evidence if the ALJ did not include in the hypothetical to the vocational expert all the claimant's credibly established impairments," McMahon v. Kijakazi, No. 1:20-CV-01320, 2022 WL 801505, at *4 (M.D. Pa. Mar. 15, 2022), and "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

Moreover, it is also well-settled that an ALJ may not allow inconsistencies between a claimant's actual skills, a vocational expert's testimony, and the criteria set forth in the Dictionary of Occupational Titles to go unaddressed and unresolved. Thus, the Third Circuit has long held that:

> To ensure consistency, courts have imposed an obligation on ALJs to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs ... and information in the [DOT]." Id. at *1; Rutherford, 399 F.3d at 556. Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) "elicit a reasonable explanation" where an inconsistency does appear, and (3) explain in its decision "how the conflict was resolved." Burns v. Barnhart, 312 F.3d 113, 127 (3d Cir.2002). An ALJ's failure to comply with these requirements may warrant remand in a particular case. Rutherford, 399 F.3d at 557.

Zirnsak, 777 F.3d at 617. Similarly, a remand is necessary if there are material ambiguities in the Vocational Expert's testimony that are not adequately addressed and resolved by the ALJ. Smith v. Astrue, 961 F. Supp. 2d 620, 658 (D. Del. 2013); Williams v. Barnhart, 424 F. Supp. 2d 796, 802 (E.D. Pa. 2006).

**C. Substantial Evidence Review – the Role of this Court.**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v.

Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to ALJ decisions, like the ruling in this case, which rest upon unresolved inconsistencies between a vocational expert's testimony and the skill requirements prescribed by the Dictionary of Occupational Titles. When such inconsistencies exist, it is incumbent upon the ALJ to: (1) identify the inconsistency; (2) address the inconsistency with the vocational expert; and (3) resolve the inconsistency in the ALJ's decision. The failure to do so often compels a remand. Zirnsak, 777 F.3d at 617.

### D. <u>This Case Will Be Remanded for Further Consideration of the Inconsistencies and Ambiguities in the Vocational Expert's Testimony.</u>

As we have noted, the ALJ's decision in this case rests upon both ambiguities with regard to precisely which occupations the vocational expert testified the plaintiff can perform despite her impairments and inconsistencies between the identified occupations, the RFC fashioned by the ALJ, and the Dictionary of Occupational Titles. Since the ALJ failed to address and resolve these material ambiguities and inconsistencies, the ALJ's reliance upon the VE's testimony is not supported by substantial evidence in this case.

The plaintiff argues that the vocational expert's hearing testimony established that an individual limited to only occasional interaction with supervisors, coworkers, and the public would be disabled despite the VE's earlier testimony that jobs existed she could perform considering her RFC. While we do not go so far as concluding, as a matter of law, that an individual who can only occasionally interact with supervisors, coworkers, and the public would be completely disabled, we agree with the plaintiff that the vocational expert's testimony was internally inconsistent and required clarification by the ALJ. Indeed, plaintiff's counsel artfully presented the same limitation prescribed in the RFC to the vocational expert in the negative, thus, if the hypothetical stated the plaintiff could only occasionally interact with

supervisors, coworkers, and the public, i.e. only up to one-third of the day, then it follows that such an individual would be *unable* to interact with others the other two-thirds of the day. When the plaintiff's counsel presented this reverse hypothetical to the vocational expert, the VE testified that, "inability to interact with others as we outlined would not be consistent with competitive employment and that would exclude all occupations." (Tr. 58). This testimony at least created a question as to the amount of time an individual being unable to interact with others would be tolerated in the workplace. Indeed, we are not persuaded by the Commissioner's argument that the vocational expert's response to this hypothetical only indicated that an individual who was off-task fifteen percent of the time or more would be disabled. This is plainly not what the VE stated since he referenced explicitly that it was the "inability to interact with others as [ ] outlined" that would be inconsistent with consistent employment.

Further, the resolution of this inconsistency was essential to determining whether jobs existed that the plaintiff could perform since the ALJ found the plaintiff was moderately limited in her ability to interact with others and could only occasionally (up to one-third of the day) interact with supervisors, coworkers, and the public. Combined with the opinion of the plaintiff's treating psychiatrist that the plaintiff would be entirely disabled due to her inability to interact appropriately with

others, the ALJ's reliance on the ambiguous and inconsistent testimony of the vocational expert as to whether the plaintiff could perform any work with this limitation was error.

This error was compounded by another latent ambiguity in the vocational expert's testimony in that, despite the RFC limiting the plaintiff to no production rate pace work, all of the jobs identified in the ALJ's decision involve assembly line work. On this score, the hypothetical the ALJ posed to the VE, which was later incorporated into the RFC, indicated that the plaintiff could only "perform tasks that do not involve a specific production rate pace such as assembly line work or an hourly production quota." [3] But all of the occupations identified by the VE, and later

---

[3] It is also worth noting that ALJs frequently clarify what is meant by "production rate pace" in hypotheticals posed to vocational experts by referencing assembly line work because other circuits have held that the term "production rate pace" is not "especially common—certainly not common enough for us to know what [the term] mean[s] without elaboration." Angela S. v. Saul, No. CV TJS-19-2849, 2021 WL 733373, at *3 (D. Md. Feb. 25, 2021) (quoting Thomas v. Berryhill, 916 F.3d 307, 312) (4th Cir. 2019)). Indeed, these circuits have found remand necessary based solely upon the failure to explain the meaning of a production rate pace in RFCs and hypotheticals to vocational experts, explaining that "we do not know what the ALJ intended when she used that phrase. As a result, it is difficult, if not impossible, to evaluate whether restricting [the claimant] to a 'non-production oriented work setting' properly accounted for [the claimant's] well-documented limitations in concentration, persistence, and pace." Perry v. Berryhill, 765 F. App'x 869, 872 (4th Cir. 2019) (citing Thomas, at 311-12; Varga v. Colvin, 794 F.3d 809, 815 (7th Cir. 2015) (ALJ's failure to define "fast paced production" made it impossible to "assess whether a person with [the claimant's] limitations could maintain the pace

relied upon by the ALJ in finding the plaintiff was not disabled,[4] require work on a conveyor belt, which has been considered assembly line work by many courts in this circuit and others. Jessica B. v. Comm'r of Soc. Sec., No. 24CV10463 (EP), 2025 WL 3749534, at *5 (D.N.J. Dec. 29, 2025) (collecting cases). See also Reed v. Saul, No. 119CV01826JPWGBC, 2021 WL 3121484, at *7 (M.D. Pa. Mar. 12, 2021), report and recommendation adopted, No. 19-CV-01826, 2021 WL 3115190 (M.D. Pa. July 22, 2021) (Court and ALJ referred to production rate pace as assembly-line work); Maxwell v. Kijakazi, No. CV 22-4465, 2023 WL 3674335, at *3 (E.D. Pa. May 25, 2023) (same); Baca v. Berryhill, No. CV 16-246 WPL, 2017 WL 3267745, at *4 (D.N.M. July 31, 2017) ("'Production rate pace' is a commonly used term to refer to assembly line work"). Thus, it appears the testimony of the VE that an

---

proposed")). Here, the ALJ provided "assembly line work or an hourly production quota" as an example of the type of production rate pace work the plaintiff could not perform, yet the DOT seems to define each of the identified occupations as assembly line work. This further compounds our conclusion that the testimony of the vocational expert in this case is simply too unreliable to constitute substantial evidence.

[4] Fusing-machine Feeder, DICOT 583.686-014, 1991 WL 684347 ("Aligns material and garment part on conveyor for feeding into machine that heat seals materials. Removes finished articles from conveyor belt."); Bottling-line Attendant, DICOT 920.687-042, 1991 WL 687971; ("Pastes labels and tax stamps on filled whiskey bottles as bottles pass on conveyor . . . ."); Sorter, Agricultural Produce, DICOT 529.687-186, 1991 WL 674781 ("Segregates produce on conveyor belt or table . . . and places produce in containers or on designated conveyors.").

individual who could not perform production rate pace positions could perform these assembly line positions was inconsistent with the DOT.

Faced with both the internal inconsistency in the VE's own testimony, and the inconsistency between the VE's testimony and the DOT, the ALJ then failed to (1) identify the inconsistencies; (2) address the inconsistencies with the vocational expert; and (3) resolve the inconsistencies in the ALJ's decision, as the ALJ was required to do under governing Third Circuit standards. This failure of analysis, in turn, prejudiced the consideration of Garland's disability claim since the ALJ found that Garland could work in these occupations which do not comport with the limitations in her RFC.

Thus, we are presented with an administrative record that discloses a cascading array of unresolved conflicts between a vocational expert's testimony and the ALJ's findings, which is unexplained and unacknowledged by either the expert or the ALJ. Boone, 353 F.3d at 209; Minichino, 955 F.Supp.2d at 380. Further, in this case there are material ambiguities in the Vocational Expert's testimony that are not adequately addressed and resolved by the ALJ. Smith, 961 F.Supp.2d at 658; Williams, 424 F.Supp.2d at 802. These factors strongly suggest the need for further consideration and clarification regarding how the additional mental limitations incorporated into Garland's RFC may erode her employment prospects.

Simply put, more is needed here. It is axiomatic that the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This means that there must be a logical nexus between the ALJ's factual findings and legal conclusion. That logical bridge is missing here. On the current record, where the hypothetical questioning of the Vocational Expert by the ALJ was both internally inconsistent, ambiguous, and inconsistent with the DOT, and those inconsistencies and ambiguities were not acknowledged, addressed, and resolved by the ALJ, the ALJ's burden of articulation is not met. Therefore, this matter will be remanded for further consideration by the Commissioner.

Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, this task should remain the duty and province of the ALJ on remand. Further, having found that a remand is justified on these grounds, we have not addressed any other claimed errors because the ALJ may in the first instance address them upon remand. See McMillan v. Comm'r of Soc. Sec., No. 16-313, 2018 WL 6617841, at *4 (D.N.J. Dec. 18, 2018); Lawrence v. Colvin, No. 15-2851, 2016 WL 1644622, at *10 (D.N.J. Apr. 26, 2016).

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: October 15, 2026